IN THE COURT OF CRIMINAL APPEALS
AT KNOXVILLE
Assigned on Briefs February 18, 2026

## STATE OF TENNESSEE v. JOSHUA BOWMAN

**Appeal from the Criminal Court for Knox County**
**No. 121961          Steven W. Sword, Judge**

_____

### No. E2025-00174-CCA-R3-ECN

_____

In 2011, a Knox County jury convicted the Petitioner, Joshua Bowman, of multiple offenses stemming from the robbery and killing of the victim. He appealed his convictions, all of which were affirmed save one: his conviction for especially aggravated kidnapping, which we remanded for a new trial based on a jury instruction error. *State v. Bowman*, No. E2012-00923-CCA-R3-CD, 2013 WL 4680402, at *1 (Tenn. Crim. App. Aug. 29, 2013), *perm. app. denied* (Tenn. Feb. 11, 2014). In 2022, the Petitioner filed a petition for a writ of error coram nobis saying that there was newly discovered evidence in the form of his mental and counseling records, which supported his "intellectually diminished capacity argument." The State did not file its response until 2025, and it asserted that the records were not newly discovered because they were his own records and, therefore, known to him. After a hearing, the *coram nobis* court dismissed the petition finding that the petition was untimely and that the Petitioner was not entitled to tolling because he was aware of his educational limitations before trial and had discussed those limitations with his trial attorney. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the Appellant, Joshua Bowman.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial and Prior Appeals**

This case arises from the Petitioner and his co-defendant, Greg Holman, participating in a home invasion robbery of Bill and Vickie Graves on May 2, 2009. The evidence at trial proved that, on May 2, 2009, Vickie Graves was at home with her husband Bill Graves in the living room. Their front door was open, and the screen door was closed but unlocked. Around 9:00 p.m., the couple heard a "buzz" from their alarm alerting them that someone was in their driveway. Mr. Graves got up to look outside, and as soon as he got to the front door, a masked man jerked open the screen door, came inside, and grabbed Mrs. Graves. A second masked man came inside immediately thereafter.

Mrs. Graves stood up, and the second man told her to sit down, putting a gun to her head. Mr. Graves saw the gun pointed at his wife, broke away from the first man, and ran toward the bedroom with the first man "right after him." Mrs. Graves begged the second man not to hurt her husband. She said she heard a "pop" and started screaming. She heard a second "pop" and called out to Mr. Graves, but he did not answer. Mrs. Graves pushed the second man away and grabbed a gun that Mr. Graves kept near his recliner. She tried to shoot the second man, but the gun would not fire. She and the second man struggled over the gun, and she heard the first man say, "'Get the safe.'" The second man answered, "'I can't. She's got a goddamn gun.'" Mrs. Graves pulled off the second man's toboggan, pulled down his bandanna, and saw a man she later identified as co-defendant Holman. She said she had never seen co-defendant Holman before that night.

Mrs. Graves ran toward the bedroom, but co-defendant Holman tackled her on the love seat and bit her arm. He took her husband's gun away from her and pushed her further into the love seat. Then he went to the front door, shut it, and opened the door to a coat closet that had been behind the open front door. Co-defendant Holman reached down, picked up a safe in the closet, and went out the front door followed by the first man. Mrs. Graves telephoned 911 and went to her husband. Blood was gushing from his upper thigh. He was conscious but could not talk, and Mrs. Graves put a shirt over his wound until the police and paramedics arrived. Mr. Graves was transported to a hospital and received blood transfusions, but he died the next day. Mrs. Graves never saw the first man's face, and she had never met the Petitioner before May 2, 2009.

Mrs. Graves said that the only people who knew about the safe were herself, her husband, their son, Mrs. Graves's nephew, Tony Wood, who had died in 2004, and his estranged wife, Tiffany Wood. At the time of his death, Tony Wood was divorcing Tiffany Wood, and he had removed Tiffany Wood as his beneficiary and made Mrs. Graves his beneficiary. Tiffany Wood was the sister of Chad Medford who was later implicated in the robbery. On the night of the robbery, the safe contained some personal papers and a

2

coin collection, including a jar of fifty-cent pieces, some silver dollars, three state quarter sets, and some old nickels. The safe did not contain any paper money.

Knox County Sheriff's Office (KCSO) deputies responded to the 911 call in this case, and on their way to the Graves' residence, they saw a safe in the center of Washington Pike with the contents of the safe spread out on the side of the road. Once they arrived, they found Mr. Graves, bleeding heavily, lying on the floor in the doorway between the master bedroom and the living room. A gun was on the floor beside Mr. Graves. Mr. Graves was transported to the hospital but ultimately died from his wounds.

Officers photographed the medium sized safe in the middle of Washington Pike and items scattered around the safe. They also collected a folded knife in a black nylon case from the driveway of the Graves' home. An officer also photographed blood droplets on the front porch and collected evidence from inside the home, including a spent Winchester .45 caliber shell casing and a black toboggan just inside the front door; a Mauser nine millimeter pistol containing five live .380 automatic rounds in the hallway in front of the master bedroom; another .45 caliber Winchester spent shell casing in front of the bedroom door; a bullet in a paperback book in the bedroom closet; and a bullet that had traveled through the wall in the hallway, separated from its metal jacket, and landed on the floor under the kitchen sink.

Another officer found two black cloth gloves on the side of Washington Pike near the Graves' home. Inside the home, police officers found two bullets. One bullet had traveled through an interior wall and landed on the kitchen floor by the sink. The other bullet was fired into the master bedroom closet and came to rest in a paperback book in the closet. On May 13, 2009, Officer Allen was called back to the scene and collected a Ruger firearm from underneath some bushes in a tree line outside the home. The gun was loaded with three .45 caliber hollow point bullets.

The Petitioner became a suspect in the home invasion and shooting. Officers located the Petitioner at a house in Loudon County, where they arrested him. He gave officers consent to search the house, and the officers collected clothing and a gun cleaning kit. While some officers were conducting the search, others transported the Petitioner to the Knoxville City–County Building. When they arrived, they put him into an interview room and gave him water and a cigarette, as requested. They advised the Petitioner of his rights, the Petitioner signed a waiver of rights form, and the Petitioner gave a statement.

The interviewing detective recounted the Petitioner's statement, which included that a relative of Mr. and Mrs. Graves, Chad Medford, had told the Petitioner and co-defendant Holman that the Graveses had "come across some money." On May 2, Mr. Medford drove the Petitioner and co-defendant Holman to the Graves' home on Washington Pike and

3

waited in the car while the Petitioner, who was armed with a handgun and wearing a bandanna, and co-defendant Holman entered the home through the unlocked front door. The Petitioner got into a physical altercation with Mr. Graves while co-defendant Holman got into an altercation with Mrs. Graves. After a physical altercation, during which co-defendant Holman ended up with the Petitioner's gun, the Petitioner heard two or three gunshots. The two men carried the safe from the home but dropped it, causing it to open. The men grabbed as much of the safe's contents as possible and ended up with $85 per person.

The Petitioner consented to a search of his vehicle during which officers found a pair of boots, a black and white scarf, a black glove, and a toboggan in the trunk. They also found red stains inside the passenger compartment, collected a sample of the stains, and sent the samples to the TBI.

A TBI expert serologist tested evidence in this case and found a DNA mixture from co-defendant Holman, Medford, and Mr. Graves on the outside of a pair of gloves found near the Graves's home. A TBI forensic scientist analyzed the Winchester .45 found at the crime scene. He determined that the shell casing by the front door and the shell casing near the bedroom were fired from the same gun. A bullet jacket found by the kitchen sink and the bullet recovered from the paperback book in the bedroom closet also were fired from the Ruger.

The medical examiner testified that Mr. Graves was shot from the back and the bullet entered his left buttock, striking his femoral artery and femoral vein. This gunshot wound caused his death.

The jury convicted the Petitioner as charged of count 1, aggravated burglary by entering a habitation with the intent to commit a theft, a Class C felony; count 2, aggravated burglary by entering a habitation and committing a felony, a Class C felony; count 3, employing a firearm during the commission of a dangerous felony, a Class C felony; count 6, the especially aggravated kidnapping of Mrs. Graves, a Class A felony; count 7, first degree felony murder committed in the perpetration of burglary; count 8, first degree felony murder committed in the perpetration of theft; count 9, first degree felony murder committed in the perpetration of robbery; and count 10, the especially aggravated robbery of Mr. Graves, a Class A felony.

Thereafter, the Petitioner pleaded guilty to count 4, employing a firearm during the commission of a dangerous felony when, at the time of the offense, he had a prior felony conviction.

4

The trial court merged the murder convictions and sentenced the Petitioner to life. After a sentencing hearing, the trial court found the Petitioner to be a career offender. It merged his aggravated burglary convictions and merged his convictions for employing a firearm during the commission of a dangerous felony. The trial court sentenced the Petitioner to fifteen years for aggravated burglary, fifteen years for employing a firearm during the commission of a dangerous felony, sixty years for especially aggravated kidnapping, and sixty years for especially aggravated robbery. The trial court ordered that the fifteen-year sentence for aggravated burglary run concurrently with his life sentence, that the fifteen-year sentence for employing a firearm during the commission of a dangerous felony run consecutively to the aggravated burglary sentence, and that the sixty-year sentences for especially aggravated kidnapping and especially aggravated robbery run concurrently with each other but consecutively to the life sentence.

The Petitioner appealed his convictions, and this court affirmed his convictions, save one: his conviction for especially aggravated kidnapping, which we remanded for a new trial based on the failure to give a proper jury instruction. *State v. Bowman*, No. E2012-00923-CCA-R3-CD, 2013 WL 4680402, at *1 (Tenn. Crim. App. Aug. 29, 2013), *perm. app. denied* (Tenn. Feb. 11, 2014).

The Petitioner timely filed a petition for post-conviction relief, alleging as relevant here that his trial counsel was deficient by allowing him to plead guilty to the firearms offense. *Bowman v. State*, E2016-01028-CCA-R3-PC, 2017 WL 1449232 (Tenn Crim. App. Apr. 24, 2017), *perm. app. denied* (Tenn. Aug. 16, 2017). The post-conviction court granted post-conviction relief from the firearm conviction to which he pleaded guilty, finding that the Petitioner did not have a qualifying prior "dangerous felony." *Id.* The post-conviction court remanded that count for further proceedings. The State appealed this finding, and this court affirmed the post-conviction court. *Id.*

## B. Error Coram Nobis

On July 12, 2022, the Petitioner filed a petition for writ of error *coram nobis*, asserting that on or about September 13, 2021, he received "newly discovered evidence" in the form of his high school medical and counseling records. These records, he posited, supported his "intellectually diminished capacity" argument that he could not have knowingly waived his *Miranda* rights. He further asserted that, had he possessed this information before his trial, it would have changed the outcome of his suppression hearing.

On January 8, 2025, the State filed a response in which it contended that the evidence cited by the Petitioner was not "newly discovered" because the Petitioner's school records were known to him at the time of trial. It further contended that there was no indication of how the records would have been admissible at trial.

The *coram nobis* court held a hearing during which the parties presented the following evidence: The Petitioner testified that his statement to police was admitted during the trial. He described the circumstances surrounding the statement by stating that law enforcement officers came to his house and drew their weapons at him when he stepped outside while the officers were in his driveway. The officers took the Petitioner inside his own home and spoke with him and then brought him to the Knox County facility. At the facility, officers showed him papers, which he signed, despite not understanding them. He also said he was threatened. The Petitioner said he did not understand his *Miranda* warnings.

The Petitioner agreed that Counsel filed a motion to suppress his statements on the basis that he was threatened. The Petitioner told counsel that there was a lot that he did not understand, and Counsel told him that it did not matter because the Petitioner had given a statement. The Petitioner said he mentioned to Counsel that he thought he should be evaluated, but Counsel did not follow up with that.

The Petitioner recounted that he received a special education diploma from high school in 2001. He said that, after his post-conviction petition, another inmate who was familiar with the law asked him if he had any mental issues, which could be the basis of an *error coram nobis* claim. The Petitioner spoke with his mother, who encouraged him to write to the Knox County School system and gave him the address. The school system did not respond, in part because of the COVID shut down, but, after he sent a second letter, the school system responded with the requested documentation. The Petitioner had not previously seen this documentation and, to his knowledge, neither had his trial counsel.

The Petitioner opined that the newly discovered documents were relevant to whether his statement should have been suppressed. He said his statement should have been suppressed because he has always had learning issues, and he did not understand the *Miranda* rights.

During cross-examination, the Petitioner testified that, in 2002, he committed five aggravated robberies and one theft. When he was arrested for those, he was given his *Miranda* rights, he waived those rights and confessed to the offenses. He entered a guilty plea in 2003. He served eight years in prison and was released shortly before he committed the robbery in this case. The Petitioner agreed that, when he was arrested in this case, the officers informed him of his *Miranda* rights.

The Petitioner agreed that the school records he submitted were his own records. Both he and his mother were present at the school meetings. The Petitioner acknowledged that he understood what getting a special education diploma meant. He maintained,

6

however, that he did not know that there was documentation supporting that he had a learning disability. The Petitioner said the records showed that he had ADHD, but he additionally has paranoia.

The Petitioner agreed that the documentation did not show that he was innocent of the offense but instead could have been used by his attorney at the suppression hearing. The Petitioner denied having anything to do with this offense.

Based upon this evidence, the *coram nobis* court found:

> The Petitioner argues that his educational records constitute newly discovered evidence, which had he possessed this information prior to trial, would have likely made a difference in the trial court's denial of his motion to suppress his confession; therefore, the result of the trial may have been different. The State argues that the information in the educational records does not constitute newly discovered evidence and would not have resulted in a different outcome had they been presented at trial.

> The petition was clearly filed outside of the one-year statute of limitations. See TCA 27-7-13. The Petitioner argues that the records are newly discovered evidence and that there should be an equitable tolling of the limitations period. . . .

> In this case, the Petitioner was fully aware of his education limitations prior to trial. The educational records existed. He discussed this issue with his trial attorney before the defense litigated the motion to suppress his confession. It could have been raised in his motion to suppress or in his petition for post-conviction relief arguing ineffective assistance of counsel. Therefore, the court finds that the Petitioner has failed to demonstrate that the education records constitute newly discovered evidence. He failed to show either in the petition or during the hearing that due process requires a tolling of the statute of limitations. The petition for writ of error fails on this ground.

> Furthermore, the court finds that had the information contained in the educational records been presented during the trial, there is no reasonable belief that the added proof may have resulted in a different outcome. To begin with, the evidence would not have been admissible at trial in that it is irrelevant. Had the records been introduced at trial, the court finds no information that would have had any impact on the jury's verdict. The jury would have seen that the Petitioner was on the low/average IQ spectrum, had

received special education while in school, started fires as a young boy, and that "[h] takes pleasure in a sense of power of being able to beat up other people who call him names or in some other way offend him verbally." . . . . none of this would have been helpful to the defense.

It is from this judgment that the Petitioner now appeals.

## II.  Analysis

On appeal, the Petitioner contends that the trial court erred when it denied his petition for writ of *error coram nobis* because the statute of limitations should be equitably tolled and the newly discovered evidence would have led to a different result at trial.  The State responds that the *coram nobis* court properly determined that the petition was barred by the statute of limitations and not subject to tolling.  The State further responds that the Petitioner did not present newly discovered evidence and that the evidence he did present was not likely to change the outcome of his trial.  Thus, the *coram nobis* court properly dismissed his petition for a writ of *error coram nobis*.

Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which are litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at trial.

The relief sought by a writ of *error coram nobis* is the setting aside of the conviction and the granting of a new trial.  *Payne v. State*, 493 S.W.3d 478, 485 (Tenn. 2016) (citation omitted).  "As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record . . . will not justify the granting of a petition for the writ of *error coram nobis* when the evidence, if introduced," might not have resulted in a different outcome.  *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (citations omitted); *see also State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007) (noting that proper standard of review is whether the proffered evidence "might have" resulted in a different outcome rather than whether it "would have" resulted in a different one).

It is well-established that the writ of *error coram nobis* "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999).  The decision to grant or to deny a petition for the writ of *error coram nobis* on its merits rests within the sound discretion of the trial

8

court. *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *Vasques*, 221 S.W.3d at 527-28). We, therefore, review for abuse of discretion. *See State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002).

A petition for a writ of *error coram nobis* must be filed within one year of the judgment becoming final in the trial court. T.C.A. § 27-7-103. This statute of limitations "is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed post-trial motion." *Nunley v. State*, 552 S.W.3d 800, 816 (Tenn. 2018) (quoting *Mixon*, 983 S.W.2d at 672); *see* T.C.A. § 27-7-103. Compliance with the one-year statute of limitations is an "essential element of a *coram nobis* claim." *Nunley*, 552 S.W.3d at 828.

The Petitioner's judgments of conviction were entered on March 9, 2011, and this court affirmed his convictions, save one, on August 29, 2013. The Tennessee Supreme Court denied his permission to appeal his convictions on February 11, 2014, and his judgments became final thirty days later. The Petitioner filed his petition for writ of *error coram nobis* relief on July 12, 2022, almost seven years after the statutory period had expired in March of 2015.

The Petitioner contends, however, that the grounds for relief qualified as later-arising because he did not know that documentation existed that supported his claims that he was intellectually challenged. The State responds that the petition was untimely and that the Petitioner has not presented evidence of actual innocence sufficient to toll the statute of limitations. We agree with the State.

If the *coram nobis* petition does not show on its face that it was filed within the one-year statute of limitations, the petition must set forth with particularity the facts demonstrating that a petitioner is entitled to equitable tolling of the statute of limitations:

> To be entitled to equitable tolling, a prisoner must demonstrate with particularity in the petition: (1) that the ground or grounds upon which the prisoner is seeking relief are "later arising" grounds, that is grounds that arose after the point in time when the applicable statute of limitations normally would have started to run; [and] (2) that, based on the facts of the case, the strict application of the statute of limitations would effectively deny the prisoner a reasonable opportunity to present his or her claims . . . . A prisoner is not entitled to equitable tolling to pursue a patently non-meritorious ground for relief.

9

*See Nunley*, 552 S.W.3d at 831. "[T]he *coram nobis* statute of limitations may be tolled only if the petitioner produces newly discovered evidence that would, if true, establish clearly and convincingly that the petitioner is actually innocent of the underlying crime of which he was convicted." *Clardy v. State*, 691 S.W.3d 390, 407 (Tenn. 2024).

Reviewing the record and the petition, we find no error in the *coram nobis* court's decision to dismiss the petition. First, we agree with the *coram nobis* court that the Petitioner failed to demonstrate that the education records constitute newly discovered evidence. As the court said, the Petitioner knew of his educational limitations before trial. He and his mother, who was at the trial every day, were both present in the meeting discussing those limitations. These records could have been obtained before the trial and do not qualify as "newly discovered."

The trial court went on to discuss that the educational records would not be relevant or helpful at trial. The educational records were not "later-arising" and do not "clearly and convincingly show that the petitioner is actually innocent of the underlying crime, i.e., that the petitioner did not commit the crime." *Clardy*, 691 S.W.3d at 409. The Petitioner has not demonstrated that the newly discovered evidence establishes his actual innocence as required to entitle him to an equitable tolling of the statute of limitations as provided in Tennessee Code Annotated section 27-7-103. Therefore, the petition is untimely.

The inquiry ends if his petition is not timely and if he has failed to demonstrate that he is entitled to relief from the statute of limitations. On its face, the petition is untimely under the one-year statute of limitations, and it contains no specific facts showing a basis for holding that he is entitled to equitable tolling of the statute of limitations.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____ s/ *ROBERT W. WEDEMEYER*__
ROBERT W. WEDEMEYER, PRESIDING JUDGE

10